No. 81,293

STATE OF KANSAS, *Appellant*, v. BILLY J. TOOTHMAN, *Appellee*.

(985 P.2d 701)

Opinion filed May 28, 1999.

*Julie A. McKenna*, county attorney, argued the cause, and *J. Wade Bainum*, assistant county attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellant.

*James D. Sweet*, of Sweet and Sheahon, of Salina, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by the State from an order of the district court suppressing evidence and dismissing the case against defendant Billy J. Toothman.

On October 7, 1997, Deputy Jack Jackson of the Saline County Sheriff's Department responded to a report of two vehicles stuck in a ditch near the State fishing lake. Jackson checked the area but found no vehicles in need of assistance. Shortly upon returning to his routine patrol duties, Jackson was called to the Salina Police Department to speak with a private citizen who wished to report "suspicious activity."

Jackson testified that the citizen told him he had helped push a blue Ford Festiva, with a Kansas tag number, out of a ditch in the vicinity of the State fishing lake. The citizen described the person operating the vehicle as a white male between the ages of 16 and 20 years old and wearing a black t-shirt and a ball cap with the Tommy Hilfiger logo on it. The citizen said the driver acted "extremely nervous" and noted that the vehicle's ignition was "punched out" and wires were hanging loosely from the steering column.

The citizen gave Jackson the tag number of the vehicle and Jackson attempted to contact Julie Penzenstadler, who was determined to be the registered owner of the vehicle. When Penzenstadler could not be reached, Jackson issued "an attempt to locate" the vehicle. Deputy Clayton, also of the Saline County Sheriff's Department, located the vehicle in the parking lot of a Motel 6

and immediately notified Jackson, who ordered him to conduct a felony stop procedure.

Jackson testified that his basis for giving this order to Clayton was the citizen's report about the ignition, the loose wires, the way the driver was acting and the fact that he could not contact the owner either on the phone or in person. These factors led Jackson to believe that the vehicle was possibly stolen. Jackson admitted there had been no report or verification of a stolen vehicle.

When Jackson arrived at the scene, Clayton was ordering someone wearing a Tommy Hilfiger ball cap and a black t-shirt to exit the vehicle. This individual was later identified as Toothman. Jackson testified that Toothman appeared to be having difficulty complying with Clayton's orders. Jackson was unsure whether Toothman did not understand Clayton's orders or whether he did not hear him, "but he did finally comply. He laid down on the ground." Jackson testified he then noticed Toothman was sweating profusely, his lips were dry, he was fidgeting, and his pupils were enlarged and nonreactive to light. These signs led Jackson to believe Toothman was under the influence of methamphetamine. The record is not clear whether Jackson observed these signs before or after he had placed Toothman in handcuffs.

Jackson stated, "After I placed Mr. Toothman in handcuffs, I observed him, asked him basically what was going on. I—that's when I checked his pupils, made my observations of him and then observed him throughout our contact." When Jackson was asked why he had placed Toothman in handcuffs, he responded, "Because of the information that I had received and also the way that Mr. Toothman was acting. I placed him in handcuffs for my safety and his safety and the other—safety of the officers."

Jackson noticed the vehicle had an expired Kansas tag and it "had no ignition and the wires were hanging from the ignition column." When Jackson questioned Toothman about the vehicle, he responded that he had permission from Gary Larson and Julie Penzenstadler to have the car. Toothman did not have a valid driver's license. Further, Toothman said "they had put a new ignition on it that day." Jackson asked him "if anything in the vehicle was his, and he said no." The officers then proceeded to remove

everything from the vehicle, including several bags. A Marlboro case containing two syringes, a black spoon appearing to have methamphetamine residue on it, and a cotton swab were found in a blue backpack. Toothman was not charged with possession of any of these items.

After handcuffing Toothman, Jackson searched Toothman's person. Jackson testified that "[w]hile patting him down I felt something in the front of his shorts area and I removed it and it was a small black bag tucked into his underwear. It contained a wooden box with marijuana and [a] marijuana smoking pipe and a clear bag that contained marijuana." While Jackson was securing the scene and placing Toothman in the back of the patrol car, Penzenstadler arrived at the scene and explained that Toothman had permission to have the vehicle. Penzenstadler told Jackson that the blue backpack belonged to her boyfriend, Gary Larson, but she denied any knowledge of the Marlboro case or the syringes found in the backpack.

On October 8, 1997, the State filed a complaint charging Toothman with possession of a hallucinogenic drug (K.S.A. 1997 Supp. 65-4162[a][3]), possession of drug paraphernalia (K.S.A. 1997 Supp. 65-4152[a][2]), operating a vehicle without a currently registered license plate (K.S.A. 1997 Supp. 8-142), and driving without a valid driver's license (K.S.A. 1997 Supp. 8-235). Toothman filed a motion to suppress any and all evidence obtained by law enforcement by means of the arrest and search of Toothman on October 7, 1997.

The district court found that the initial stop was based on a "report by a private citizen that he viewed what he thought was suspicious activity, but no crime was being committed, had been committed, or was about to be committed by what the private citizen had seen." The court also noted that "nervousness is not the sole grounds by which a person can be stopped either by law enforcement or by an untrained private citizen." Because the district court found the search was conducted on an unparticularized suspicion or hunch, which did not rise to the level of probable cause, it granted the motion to suppress and dismissed the case against Toothman. The court ruled:

"There is no suspicion or grounds by which a vehicle can be stopped and something more than an unparticularized suspicion or hunch must be articulated, *United States v. Sokolow*, 490 U.S. 1, [104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989)] in order for the officer to make a stop. There was no traffic infraction, there [was no] known criminal activity seen or going on. There was no report of a stolen vehicle. Nervousness alone is not a basis by which a person can be stopped. The expired tag [and the] expired driver's license were all after the stop had been initiated. The only thing the officer could have done in order to get this cleared up was having the verifiable facts of the make and model of the car along with the license plate was to have contacted the owner with regards to whether or not the vehicle was reported missing. After [that] a known or unknown criminal activity could have been investigated. Other than that, we are going on an unparticularized suspicion or hunch which does not rise to the level of probable cause. The motion to suppress is granted, counsel. The case against Mr. Toothman is dismissed. Thank you, counsel."

This court recently stated the appellate standard of review when analyzing a district court's suppression of evidence in *State v. DeMarco*, 263 Kan. 727, 952 P.2d 1276 (1998). An appellate court reviews the factual underpinnings of a district court's decision "by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review." 263 Kan. 727, Syl. ¶ 1. See *State v. Hopper*, 260 Kan. 66, 68-69, 917 P.2d 872 (1996). Also, "[t]he State bears the burden of proving the lawfulness of the search and seizure at the hearing on a motion to suppress. *State v. Garcia*, 250 Kan. 310, Syl. ¶ 1, 827 P.2d 727 (1992)." 263 Kan. at 732.

K.S.A. 22-2402(1) provides that "[w]ithout making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand . . . the name [and] address of such suspect and an explanation of such suspect's actions." In *Hopper*, the court stated that "K.S.A. 22-2402(1), the Kansas stop and frisk statute, is a codification of the Fourth Amendment search and seizure principles expressed in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)." 260 Kan. at 69.

In *Hopper*, the officer stopped the driver of a vehicle for driving left of center. The issue in *Hopper* was stated as whether the officer had a reasonable suspicion, "based on articulable facts that anyone in Hopper's vehicle had committed, was committing, or was about to commit a crime, or that there were valid public safety concerns present justifying the stop." 260 Kan. at 73. In this case, Toothman was ordered out of the vehicle due to Jackson's belief that he was operating a possibly stolen vehicle. The district court found insufficient facts to support the belief of a stolen vehicle because there was no report of a stolen vehicle and Jackson based this conclusion on a report of "suspicious activity" by a private citizen.

The district court noted that the stop could only have been justified as a *Terry* stop. In order to initiate a legal traffic stop under *Terry*, however, "the officer must have a reasonable and articulable suspicion based on fact that the person stopped has committed, is committing, or is about to commit a crime."

We disagree with the trial court. Here, Jackson had a tag number, a description of the car, and a description of the clothing worn by the driver. Jackson had information that the vehicle was "stuck" in a ditch and that the driver appeared to be "extremely nervous." More importantly, Jackson was informed "that the ignition had been punched out of the steering column; there were wires hanging loosely from it."

Once the vehicle was stopped, it was discovered the vehicle had an expired tag and Toothman did not have a valid driver's license. After the stop, Jackson also observed Toothman. We have had the opportunity to view the videotape which demonstrates unusual movement on Toothman's part.

Of even greater significance is the fact Jackson learned the vehicle was owned by a young woman who could not be contacted by phone or in person at her home. Thus, Jackson had a valid reason to see if the vehicle was stolen and the owner was safe. The search of Toothman's person was justified, both as part of the *Terry* stop and as a search incident to Toothman's arrest for no driver's license and improper registration of the vehicle.

In *DeMarco*, 263 Kan. at 734-35, Justice Six, writing for the court, wrote:

"We said in *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993): 'The officer making the stop must be able to articulate the basis for his reasonable suspicion. What is reasonable is based on the totality of circumstances and is viewed in terms as understood by those versed in the field of law enforcement.' In reviewing factors advanced by the government to prove reasonable and articulable suspicion, the Tenth Circuit said in *Mendez*:

'When evaluating these factors, we judge the officer's conduct in light of common sense and ordinary human experience. [Citation omitted.] "Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious," [citation omitted], but to determine whether the totality of the circumstances justify the detention. [Citation omitted.] We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, [citation omitted], remembering that reasonable suspicion represents a "minimum level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 . . . .' 118 F. 3d at 1431.

The United States Supreme Court has described 'reasonable suspicion' as ' "a particularized and objective basis" for suspecting the person stopped of criminal activity.' *Ornelas [v. United States]*, 517 U.S. at 696. Something more than an unparticularized suspicion or hunch must be articulated. *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989).

"Reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Both reasonable suspicion and probable cause are dependent upon the content of information possessed by the detaining authority and the information's degree of reliability. Quantity and quality are considered in the 'totality of the circumstances—the whole picture' that must be taken into account when evaluating whether there is reasonable suspicion. *Alabama v. White*, 496 U.S. 325, 330, 110 L. Ed. 2d 301, 110 S. Ct. 2412 (1990)."

Based on the totality of the circumstances, we conclude Jackson had a reasonable and articulable suspicion sufficient to justify a *Terry* stop to ascertain why the ignition had been punched out and apparently hot-wired, as well as to ascertain who was driving the car and to ensure that the owner of the vehicle was safe.

Reversed and remanded for further proceedings.

ALLEGRUCCI, J., dissenting: K.S.A. 22-2402(1) provides that an officer may stop a person in public whom such officer "reasonably suspects is committing, has committed or is about to commit a crime and may demand . . . the name [and] address of such suspect and an explanation of such suspect's action." I disagree with the majority that the private citizen's report in the present case was

sufficient to support a stop under K.S.A. 22-2402(1). However, even if it was sufficient, the officer never asked Toothman for identification or an explanation until after he was on the ground and handcuffed. The officer did not have reason to suspect that the vehicle was stolen and, when finally asked, Toothman explained the circumstances for his driving the car and the reason for the exposed wires, all of which was true and was confirmed within a short time by the arrival of the owner of the vehicle at the scene.

The majority, in my judgment, continues to approve police searches and seizures which violate both our statutes and the Fourth Amendment to the United States Constitution.

The district court's findings that the officer did not have a reasonable suspicion that the vehicle was stolen is supported by substantial competent evidence, and the district court's granting of the motion to suppress the evidence should be affirmed.

LOCKETT, J., joins the foregoing dissenting opinion.