(134 P.3d 677)

No. 94,249

STATE OF KANSAS, *Appellant,* v. JON D. KOTAS, *Appellee.*

—

Opinion filed May 26, 2006.

*Matt J. Maloney*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, for appellant.

*Laura B. Shaneyfelt*, of Hulnick Law Offices, P.A., of Wichita, for appellee.

Before MARQUARDT, P.J., MALONE and BUSER, JJ.

BUSER, J.: The State of Kansas appeals the district court's order suppressing evidence obtained from a traffic stop of a vehicle driven by Jon D. Kotas. We reverse and remand.

### Factual and Procedural Background

On April 24, 2004, Deputy Earnest Sims Jr. of the Sedgwick County Sheriff's Department was assigned to drive a "chase car" stationed near a DUI checkpoint. According to Deputy Sims' testimony at the suppression hearing, it was the sheriff department's policy to chase vehicles that elude a DUI checkpoint and to stop them if they commit a traffic violation.

The checkpoint was established on the east side of the bridge located on east 47th Street south. It had lights and indications alerting motorists driving on the bridge of its presence.

Between 1:45 a.m. and 2 a.m., Deputy Sims noticed a black 2002 Subaru approaching from the west. The Subaru was at the middle of the bridge when Kotas slowed down and made a U-turn across solid double yellow lines and headed back west on 47th Street. As a result of Kotas slowing down to maneuver the U-turn, several vehicles about 30 to 40 feet behind the Subaru slowed down. There were no vehicles approaching the Subaru from the east at the time

of the U-turn. The speed limit on the bridge was 40 miles per hour, and it did not appear to Deputy Sims that the Subaru was exceeding the speed limit. There were no signs or other markings prohibiting U-turns on the bridge.

Deputy Sims chased the Subaru a short distance and stopped it. After identifying the driver as Kotas, Deputy Sims wrote citations for making a U-turn when not safe and clear, in violation of K.S.A. 8-1546(a), and for driving under the influence of alcohol and/or drugs, in violation of K.S.A. 8-1567(e). The latter citation recorded Kotas' blood alcohol level at .112.

Kotas moved to suppress evidence obtained as a result of the traffic stop. After hearing evidence from Deputy Sims at the suppression hearing, the district court discussed *City of Manhattan v. Larson*, 26 Kan. App. 2d 851, 853, 994 P.2d 1087 (2000), and a case that decision cites, *State v. Greer*, 114 Ohio App. 3d 299, 683 N.E. 2d 82 (1996). The district court described *Greer* as follows:

"[A]n officer mistakenly believed that a driver['s] U-turn was in violation of an ordinance. The trial court determined that that was insufficient cause for the stop but the Ohio [C]ourt of [A]ppeals overruled the court['s] decision saying it could not find the officers['s] act of stopping to have been unreasonable under all circumstances and the Ohio Supreme Court reversed the trial court['s] suppression of evidence. And I guess I view that as some authority, that the [Kansas C]ourt of [A]ppeals would probably take the position that whether or not the U-turn was in fact a violation of the ordinance, traffic ordinance so long as the officer had a reasonable belief that it was a violation . . . that's sufficient reasonable suspicion to stop the car."

In overruling the motion to suppress, the district court stated that under *Larson* it need not decide whether Kotas' U-turn was illegal because it was reasonable for Deputy Sims to think so.

Kotas later filed a motion for reconsideration based on *State v. Knight*, 33 Kan. App. 2d 325, 104 P.3d 403 (2004), which was filed 4 months prior to the suppression hearing. At the hearing on reconsideration, the district court prefaced its consideration of the parties' arguments by stating:

"[I]t is pretty clear that the officer was of the opinion that a traffic violation was required in order for him to effectuate a traffic stop. It is also clear that the reason that Deputy Sims made the traffic stop was because he believed that an illegal U-turn had been committed. And the reason that he believed an illegal U-turn had

been committed was because the U-turn was made in the middle of a bridge. And in order to execute the U-turn Mr. Kotas had to cross a double yellow line. I've reviewed the U-turn statute, K.S.A. 8-1546, and the statute doesn't deal with U-turns across the bridge or across a double yellow line."

In its argument, the State countered:

"On these facts, a U-turn on a bridge across a double yellow line . . . would meet the requirement that the movement cannot be made unless it's done in safety and without interfering with other traffic. We don't have to have a T-bone accident in the middle of that bridge to know it's not safe to do a U-turn across a double yellow line on a four-lane bridge and that makes that reasonable. And . . . I think the State can almost meet its burden of getting a conviction on that statute."

The district court took the matter under advisement. In its memorandum decision, the district court addressed the State's argument as follows:

"The State has advanced the argument that the stop in this case was valid, and the ticket was properly issued since an argument can be made that the [U]-turn made by [Kotas] in this case was not a movement that could be made in safety. The State contends that the stop was reasonable because it can legitimately argue that a [U]-turn on a bridge across a double yellow line is a traffic maneuver that is not safe.

"The problem with this argument is that Deputy Sims testified that when [Kotas] executed the [U]-turn, there was no traffic coming from the opposite direction, and the traffic behind [Kotas] was not required to stop or take evasive action. There simply is no evidence that the [U]-turn executed by [Kotas] was unsafe, or that it created danger for other drivers on the road. More to the point, though, is the fact that Deputy Sims testified that he stopped [Kotas] not because he felt that the [U]-turn maneuver was unsafe, but because of his belief that it was not legal for a driver to execute a [U]-turn on a bridge across a double yellow line."

After a thorough discussion of the district court's understanding of the precedent established by *Larson* and *Knight*, as well as the law of other jurisdictions, the district court held that "*Knight* requires that law enforcement officers employ a 'common sense interpretation' of the statutes they are charged with enforcing; *Knight* does not require that law enforcement officers possess the knowledge and skill of lawyers and judges in the interpretation of traffic statutes." Based on this legal standard, the district court held that "Deputy Sims' mistake as to the application of the law was not

objectively reasonable. As such, the traffic stop was invalid, and all evidence obtained as a result of that stop must be suppressed."

## Terry Stop

The State maintains Deputy Sims had a reasonable suspicion that Kotas made an illegal U-turn on the bridge sufficient to validate Deputy Sims' car stop. The State bore the burden to prove the traffic stop was lawful. See *State v. Toothman*, 267 Kan. 412, Syl. ¶ 2, 985 P.2d 701 (1999). Our standard of review is as follows:

"When analyzing a district court's suppression of evidence, an appellate court reviews the factual underpinnings of a district court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review." 267 Kan. 412, Syl. ¶ 1.

Moreover, in *Toothman*, our Supreme Court explained how an appellate court should consider the issue of whether a law enforcement officer had reasonable suspicion to stop an individual:

"When evaluating reasonable suspicion, we judge an officer's conduct in light of common sense and ordinary human experience. Our task is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious, but to determine whether the totality of the circumstances justify the detention. We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, remembering that reasonable suspicion represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." *Toothman*, 267 Kan. 412, Syl. ¶ 4.

K.S.A. 22-2402(1) is a codification of the Fourth Amendment search and seizure principles expressed in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). K.S.A. 22-2402(1) provides: "Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such suspect and an explanation of such suspect's actions." The stop of a moving vehicle always constitutes a seizure. To make a valid car stop, an officer must have articulable facts sufficient to constitute reason-

able suspicion under K.S.A. 22-2402(1). *State v. McKeown*, 249 Kan. 506, 510, 819 P.2d 644 (1991).

Although reasonable suspicion is a less demanding standard than probable cause, it still requires something more than an unparticularized suspicion or hunch. *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989).

"Reasonable suspicion means a particularized and objective basis for suspecting the person stopped is involved in criminal activity. Something more than an unparticularized suspicion or hunch must be articulated. Reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Both reasonable suspicion and probable cause are dependent upon the content of information possessed by the detaining authority and the information's degree of reliability. Quantity and quality are considered in the totality of the circumstances—the whole picture that must be taken into account when evaluating whether there is reasonable suspicion." *Toothman*, 267 Kan. 412, Syl. ¶ 5.

Finally, the test under the Fourth Amendment focuses on the objective facts known to a law enforcement officer, not the officer's subjective intentions or motivations. See *Devenpeck v. Alford*, 543 U.S. 146, 153-54, 160 L. Ed. 2d 537, 125 S. Ct. 588 (2004); *United States v. Williams*, 271 F.3d 1262, 1271 (10th Cir. 2001); *State v. Canaan*, 265 Kan. 835, 841, 964 P.2d 681 (1998).

Deputy Sims suspected Kotas had violated K.S.A. 8-1546(a), which states: "The driver of any vehicle shall not turn such vehicle so as to proceed in the opposite direction unless such movement can be made in safety and without interfering with other traffic." In his testimony, Deputy Sims stated Kotas' U-turn on a bridge was not "safe and clear." On the citation Sims prepared after the car stop he handwrote that the offense was "make u-turn when not safe and clear" and referenced the appropriate statute, K.S.A. 8-1546(a), which proscribes such conduct. Put another way, in Deputy Sims' opinion, Kotas did not make the U-turn "in safety and without interfering with other traffic."

The district court disagreed, considering Deputy Sims' opinion not only wrong but unreasonable. In the district court's opinion, there was no safety hazard or traffic interference because the U-turn was executed across solid double yellow lines on a bridge

causing vehicles 30 to 40 feet behind Kotas to slow down while Kotas executed this maneuver.

Importantly, all of the underlying facts, such as the nature of Kotas' turn, the location of its execution on the bridge, the presence of solid double yellow lines, the movement of the vehicles traveling behind Kotas, and the location of the checkpoint were undisputed. The district court's holding that Deputy Sims' opinion was not reasonable based on those facts was the ultimate legal conclusion, and it is reviewed de novo. Upon such review, we determine that Deputy Sims had a particularized and objective basis for suspecting Kotas had executed an illegal U-turn. Several factors compel this conclusion.

First, while Kotas' U-turn was not necessarily prohibited simply by the presence of solid double yellow lines, a law enforcement officer reasonably could consider the significance of these markings in ascertaining whether the traffic maneuver was safe. Indeed, these lines alert a motorist that driving on the left side of the roadway is "especially hazardous." K.S.A. 8-1520(a). Under the 2003 edition of the Federal Highway Administration Manual on Uniform Traffic Control Devices for Streets and Highways, Section 3B.01(C), portions of roadways where "crossing the centerline markings for passing is prohibited" are indicated by solid double yellow lines. In making a U-turn, any vehicle would naturally cross the centerline. The cited authority supports the conclusion that in these designated areas U-turns are less safe and more likely to interfere with traffic.

Second, the legislature has given special attention to safety issues attendant to bridges. Under K.S.A. 8-1571, for example, no person shall stop, stand, or park a vehicle "[u]pon any bridge or other elevated structure upon a highway." K.S.A. 8-1571(a)(1)(vii). This provision, when considered with the statute's prohibitions against stopping, standing, or parking in intersections, alongside street excavations, or on railway tracks, clearly was intended to provide for the safe and free flow of traffic. See K.S.A. 8-1571(a)(1)(iii), (vi), and (viii); *State v. McCurry*, 279 Kan. 118, 121, 105 P.3d 1247 (2005) (judicial interpretation must fairly and reasonably effect the legislature's design and intent). As a result, it would be reasonable

for an officer to consider Kotas' location on a bridge when evaluating whether his U-turn was "safe and clear."

Third, the evidence was uncontroverted that several cars were required to slow down from speeds of about 40 mph to avoid colliding with Kotas while he executed his U-turn maneuver. Given the confined structure of the bridge and the unusual circumstance of a driver making a U-turn in the early morning hours while driving across it, a trained law enforcement officer could reasonably suspect that Kotas, by forcing the vehicles behind him to slow, had "interfer[ed] with other traffic." A law enforcement officer could also reasonably suspect that a U-turn which interfered with traffic in such a way on a bridge at night could not be "made in safety." K.S.A. 8-1546(a).

We view these facts with "deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances," and that "reasonable suspicion represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." *Toothman*, 267 Kan. 412, Syl. ¶ 4. Given the minimum objective justification required at the suppression hearing, the district court erred in holding Deputy Sims did not have reasonable suspicion to stop Kotas for making a U-turn when not safe and clear, in violation of K.S.A. 8-1546(a).

Finally, we note the district court considered our opinions in *City of Manhattan v. Larson*, 26 Kan. App. 2d 851, 853, 994 P.2d 1087 (2000), and *State v. Knight* in detail before concluding *"Larson* appears to have been implicitly overruled by *Knight* . . . . Whether this was the intent of the appellate court, or whether *Larson* survives albeit in some modified form is not clear."

We view these two cases as factually distinguishable. In *Larson,* the defendant was stopped for expired tags in violation of K.S.A. 1997 Supp. 8-134. The particular truck Larson was driving, however, had a statutory grace period which allowed him to renew his license plate by February 15 of each year without imposition of penalties for driving the truck with an expired license. K.S.A. 8-134(a).

In upholding the car stop we noted: "Officer Schuck's suspicion that Larson violated a statute by driving a vehicle with an expired license plate was reasonable *because the tag had expired*. . . . but because of the grace period, he was acquitted of that charge in municipal court." (Emphasis added.) 26 Kan. App. 2d at 853-54. In both *Larson* and the present case, law enforcement officers stopped vehicles and issued citations based upon a reasonable suspicion that traffic ordinances had been violated. Both defendants were stopped for conduct that, based upon a reasonable interpretation of the statutes, was actually proscribed by Kansas law.

In *Knight,* a police officer stopped a vehicle for the nonexistent crime of failing to signal while turning from private property onto a public street. This traffic movement was not conduct proscribed by the City of Wichita. 33 Kan. App. 2d at 326-27. The ordinance which the police officer cited Knight for violating (City of Wichita Code Section 11.28.040[a] [2005]) only applied to "turning into a driveway from a roadway." 33 Kan. App. 2d at 327. In short, the police officer stopped Knight for conduct (turning from a driveway onto a roadway) that, under any conceivable interpretation, was not prohibited by the Wichita Code or any other state law. As a result, the traffic stop was unreasonable.

In the present case, the statute Kotas was charged with violating, K.S.A. 8-1546(a), by its express language is subject to interpretation and judgment regarding what constitutes a U-turn that "can be made in safety and without interfering with other traffic." Ultimately it will be for the district court to determine whether the State can prove its allegation beyond a reasonable doubt. For purposes of evaluating the propriety of this car stop, however, we hold that Deputy Sims had a reasonable belief based upon objective and articulable facts that Kotas' U-turn violated K.S.A. 8-1546(a). As a result, the car stop was valid and seizure of the evidence did not violate the Fourth Amendment to the United States Constitution or K.S.A. 22-2402(1).

Reversed and remanded.