No. 125,566

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CITY OF OVERLAND PARK,
*Appellee*,

v.

LEONARD LAGUARDIA,
*Appellant*.

SYLLABUS BY THE COURT

1.

Traffic stops cannot be measurably extended beyond the time necessary to process the infraction that prompted the stop unless there is a reasonable suspicion of or probable cause to believe the detainee is involved in other criminal activity.

2.

Officers must be careful to ensure that any inquiries of matters beyond the reason for the traffic stop occur concurrently with the tasks permitted for such stops so they will not measurably extend the time it would otherwise take. This is called multitasking. If an officer is not effectively multitasking, these unrelated inquiries—without reasonable suspicion, probable cause, or consent—impermissibly expand the stop beyond what the United States Constitution permits.

3.

The prosecution does not meet its burden by simply proving that the officer believed the circumstances could have formed a reasonable suspicion. Rather, something more than an unparticularized suspicion or hunch must be articulated by the officer. Consistent with this long-standing caselaw, we find that the prosecution does not meet its

1

burden by pointing to factors not articulated by the officer that could have formed a reasonable suspicion in an effort to justify the delay after the fact. The focus must be on the factors, if any, articulated by the officer.

Appeal from Johnson District Court; CHRISTINA DUNN GYLLENBORG, judge. Oral argument held April 11, 2024. Opinion filed July 5, 2024. Reversed and remanded with directions.

*Adam D. Stolte*, of Stolte Law, LLC, of Overland Park, for appellant.

*Melissa Ruttan*, assistant city attorney, for appellee.

Before ARNOLD-BURGER, C.J., MALONE and WARNER, JJ.

ARNOLD-BURGER, C.J.:  Leonard LaGuardia crashed his car into a guardrail on the highway in snowy conditions. The issue here is whether the officer had a reasonable suspicion that LaGuardia was intoxicated in order to request that he complete several field sobriety tests in the field. After a review of the evidence and the relevant caselaw, we find that LaGuardia was unlawfully detained and his motion to suppress evidence should have been granted. Accordingly, we reverse his conviction and remand with instructions to suppress, upon retrial, all evidence collected after the officer decided to administer the HGN test.

## FACTUAL AND PROCEDURAL HISTORY

In the early morning hours in January 2020, a passerby reported a single-car accident on southbound 69 Highway north of 103rd Street in Overland Park. It had been snowing and sleeting that day, and the roads were slushy and covered with about an inch of snow. Officer Eric Opperman responded to the scene.

2

When he arrived, he did not see a vehicle. But he did see some debris, including a passenger car bumper, that appeared to be from the car crash. Soon after, a captain notified Officer Opperman that he saw a damaged vehicle leaving the area on a traffic camera. The officer attempted to find the vehicle, eventually locating it on Mastin Street, which is north of 103rd Street. The vehicle was unoccupied, had heavy damage to its front end, damage to its rear end, and was missing its bumper. It also had a flat tire. The car was not covered in snow, indicating that it had been recently driven.

Before Officer Opperman left the vehicle to locate the driver, a tow truck pulled up to retrieve it. The driver of the tow truck told the officer that the owner of the damaged vehicle had asked him to meet him over by the Shell gas station on 103rd Street.

Officer Opperman eventually located the driver, later identified as LaGuardia, after he had been seen on a traffic camera walking on foot away from his car. LaGuardia was on 103rd Street, about 300 yards away from the wrecked car near the Shell gas station—consistent with the tow truck driver's report. The officer began talking to LaGuardia.

LaGuardia confirmed that he was the driver of the car and had been in an accident. He told the officer that he lost control of his vehicle after sliding in some snow and hit a guardrail. And he explained that he abandoned his vehicle on Mastin Street because he was not comfortable staying in a residential area in front of people's homes. LaGuardia also mentioned that he called a tow truck to retrieve his car, but hoped to get an Uber because he was not sure if the tow truck was coming. LaGuardia himself never reported the accident to law enforcement—it was called in by a passerby.

Officer Opperman asked for LaGuardia's license because he wanted to start a crash report and LaGuardia complied. Rather than start a crash report, the officer ran

3

LaGuardia's license though dispatch. The results showed that LaGuardia had a valid license and no warrants for arrest.

Officer Opperman continued talking to LaGuardia because he had some questions about why he abandoned his car. The officer testified that LaGuardia's story about why he walked away from his car did not make sense to him. It struck Opperman that LaGuardia was attempting to hide that he was impaired when he was driving since LaGuardia did not report the accident to police, but had a valid license, registration, and no arrest warrants. Opperman testified that he was suspicious because of the time of the crash, no other vehicles being involved, and the fact that LaGuardia left the scene. The officer agreed that unless there were injuries from the collision or damage in excess of $1,000, city ordinance did not require that the collision be reported. And the State offered no evidence regarding the value of the damage, and there was no evidence Opperman was injured in the collision. Opperman told LaGuardia that he did not find it suspicious in and of itself that LaGuardia wrecked his car, but he did find it suspicious that LaGuardia left the parked car to meet an Uber.

It is telling that LaGuardia  was not charged with failure to report an accident to police or leaving the scene of an accident. It is not unreasonable to conclude that Opperman did not believe LaGuardia violated the law. Again, this conclusion is bolstered by the bodycam video that was introduced at the suppression hearing. The officer actually doubled down on this point when he verified what was on the bodycam video—that he told LaGuardia that he could understand why LaGuardia did not call the police. During that same discussion, captured on the bodycam video, Opperman told LaGuardia that the fact that he wrecked his car in slushy weather was not a problem or suspicious. But the officer found it suspicious that LaGuardia left the car to meet an Uber, rather than wait in the relative warmth of the parked car for the tow truck to arrive. Opperman never alleged failing to wait for a tow truck in your car was against the law, he just thought it did not make sense.

With no more than a belief that LaGuardia's story about leaving his car to meet an Uber did not make sense, while observing no signs of impairment, Officer Opperman began a driving under the influence (DUI) investigation. He asked LaGuardia to step in front of his police car and perform the Horizontal Gaze Nystagmus (HGN) test.

While conducting the HGN test, Officer Opperman smelled alcohol on LaGuardia's breath. LaGuardia denied having had any drinks that night. At this point, the officer asked LaGuardia to step over to the gas station canopy to get out of the weather, since it was still snowing.

The officer asked LaGuardia to complete two field sobriety tests—the walk-and-turn and the one-leg stand. On the walk-and-turn test, the officer testified that he observed that LaGuardia showed three clues of impairment—raising his arms for balance, stumbling to his right when he made a turn, and failing once to touch his heel to toe. But LaGuardia passed the second test, the one-leg stand. There was no evidence to dispute LaGuardia's claim to the officer that evening that he had problems with his knee, but Opperman admitted he did not take that into consideration in scoring the walk-and-turn test.

After waiting the appropriate amount of time, Officer Opperman asked LaGuardia to submit to a preliminary breath test (PBT) and LaGuardia agreed. Before taking the breath test, LaGuardia admitted, for the first time, to the officer that he had consumed four Corona beers and a mixed shot at a billiards bar in Shawnee between 8:45 p.m. and 11 p.m. LaGuardia also admitted that he left his car because he was concerned that he might be impaired and was scared to stay. LaGuardia was arrested.

LaGuardia agreed to take a blood test and was transported to a hospital. Officer Opperman issued LaGuardia a DUI citation before the blood results came back. The blood test showed that LaGuardia's blood alcohol content was 0.088.

5

*LaGuardia's Motion to Suppress*

Before trial, LaGuardia moved to suppress evidence, asserting Officer Opperman lacked reasonable suspicion to start a DUI investigation and he lacked reasonable suspicion to request a PBT. The City responded, arguing that the officer had reasonable suspicion to believe LaGuardia was impaired and to investigate a possible DUI because LaGuardia crashed his car into a guardrail, acted strangely after the accident, and failed to report the accident to police.

The district court held an evidentiary hearing on the motion where Officer Opperman testified, as previously described. In addition, a video of the encounter was admitted into evidence and viewed by the district judge, but unfortunately the video is not contained in the record on appeal for us to review. There was evidence presented at trial regarding the content of the bodycam video, which was not disputed—the same video shown to the district judge at the suppression hearing.

At the hearing, LaGuardia pointed to a report that the officer made after the DUI investigation noting that LaGuardia's eyes looked normal, his speech and walking was normal, and he had orderly clothing and a cooperative attitude. And LaGuardia argued that it was not unreasonable that he did not report the crash because several weeks before, Overland Park made a public safety announcement instructing people not to report noninjury accidents.

The City highlighted LaGuardia's admission to consuming four alcoholic drinks before the PBT was administered and that he failed the walk-and-turn test. It also pointed to the fact that in the officer's training and experience, it can suggest intoxication when a person leaves the scene and does not stay with their vehicle, which LaGuardia did. The City also stated that LaGuardia did not claim that the public safety announcement meant

6

that he should not have reported his accident during that time frame and because it occurred around 2 a.m.

After considering this evidence, the district court denied LaGuardia's motion to suppress. It found that, under the totality of the circumstances, the officer had reasonable suspicion to conduct a DUI investigation and request that LaGuardia take a PBT.

A jury convicted LaGuardia of operating a vehicle with a blood alcohol content of 0.08 or more as measured within three hours of operating a vehicle. It acquitted him of operating a vehicle while under the influence of alcohol to a degree that rendered him incapable of safely driving a vehicle. The district court sentenced LaGuardia to a year of probation with a 90-day underlying prison sentence and 48 hours in custody. LaGuardia appeals.

ANALYSIS

When a defendant moves to suppress, the State must prove to the district court that the search and seizure was lawful using a preponderance of the evidence standard. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006). This court reviews factual underpinnings of a district court's decision on a motion to suppress evidence for substantial competent evidence and its ultimate legal conclusion de novo. *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019). If the facts are not disputed, the suppression issue is a question of law which appellate courts review without restraint. *State v. Bickerstaff*, 26 Kan. App. 2d 423, 424, 988 P.2d 285 (1999).

The Fourth Amendment to the United States Constitution and section 15 of the Kansas Constitution Bill of Rights prohibits unreasonable searches and seizures. U.S. Const. amend. IV; Kan. Const. Bill of Rights, § 15. The United States Supreme Court has interpreted this prohibition to require law enforcement officers who seize or search an

7

individual to have either a warrant or rely on one of the recognized exceptions to the warrant requirement. *State v. Sanders*, 310 Kan. 279, 285, 445 P.3d 1144 (2019) (citing *Riley v. California*, 573 U.S. 373, 382, 134 S. Ct. 2473, 189 L. Ed. 2d 430 [2014]).

One of those exceptions is that a police officer may "stop and briefly detain an individual without a warrant when the officer has an articulable and reasonable suspicion, based in fact, that the detained person is committing, has committed, or is about to commit a crime." *Sanders*, 310 Kan. at 286; see K.S.A. 22-2402(1); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). "Reasonable suspicion is a lower standard than probable cause, and '[w]hat is reasonable depends on the totality of circumstances in the view of a trained law enforcement officer.'" *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017); *State v. Martinez*, 296 Kan. 482, 487, 293 P.3d 718 (2013). The totality of the circumstances includes consideration of the quantity and quality of the evidence—in other words, the court must account for the whole picture. *State v. Pollman*, 286 Kan. 881, 890, 190 P.3d 234 (2008); *State v. Toothman*, 267 Kan. 412, Syl. ¶ 5, 985 P.2d 701 (1999).

"[I]n addition to being justified at its inception, a lawful stop must be reasonably related in scope to the circumstances justifying the interference in the first place." *State v. Jimenez*, 308 Kan. 315, 323, 420 P.3d 464 (2018) (citing *Terry*, 392 U.S. at 20). Traffic stops cannot be measurably extended beyond the time necessary to process the infraction that prompted the stop unless there is a reasonable suspicion of or probable cause to believe there is other criminal activity. 308 Kan. at 324. The information required for a traffic investigation usually includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). Investigation into other crimes "diverts from that mission and cannot become a permissible *de minimis* intrusion" unless the officers have facts causing them to suspect that some other crime has been committed. *Jimenez*, 308

8

Kan. at 317 (citing *Rodriguez*, 575 U.S. at 355-57). Officers must be careful to ensure that any inquiries of matters beyond the reason for the traffic stop occur concurrently with the tasks permitted for such stops so they will not measurably extend the time it would otherwise take. 308 Kan. at 326. This is called multitasking. If an officer is not effectively multitasking, these unrelated inquiries—without reasonable suspicion, probable cause, or consent—impermissibly expand the stop beyond what the Constitution permits. 308 Kan. at 325-26.

So once the seizure takes place, an officer may expand the investigative detention beyond the duration necessary to fulfill the purpose of the *initial* stop only if there is an objectively reasonable and articulable suspicion that criminal activity was or is taking place. *State v. Jones*, 300 Kan. 630, 641, 333 P.3d 886 (2014).

The United States Supreme Court has explained that the prosecution does not meet its burden by simply proving that the officer believed the circumstances *could* have formed a reasonable suspicion. Rather, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. "Something more than an unparticularized suspicion or hunch must be articulated." *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998). Consistent with this long-standing caselaw, we find that the prosecution cannot meet its burden by pointing to factors not articulated by the officer that *could* have formed a reasonable suspicion in an effort to justify the delay after the fact. The focus must be on the factors, if any, articulated by the officer.

There is no dispute here that the officer had reasonable suspicion to investigate LaGuardia's involvement in the single car crash into the guardrail. The issue is whether the officer unreasonably extended the scope of the stop to include a DUI investigation.

LaGuardia argues that Officer Opperman lacked reasonable suspicion to extend the stop from a crash report to a DUI investigation. He claims that the officer investigated LaGuardia for DUI only because he abandoned his vehicle after the accident in snowy conditions. LaGuardia argues that the officer did not notice any signs of impairment or smell alcohol on his breath before he started the DUI investigation, but only thought he was trying to hide something. In other words, Opperman acted off a hunch, or something less, which falls short of reasonable suspicion. *Pollman*, 286 Kan. at 890 (an unparticularized hunch is not reasonable suspicion). We agree.

At the point the officer extended the stop, the undisputed facts presented at the suppression hearing were as follows.

At 2 a.m., LaGuardia crashed his car into a guardrail, drove his heavily damaged car away from the scene of the accident to a secondary location, called a tow truck, and then abandoned his car on foot in the snow to meet an Uber driver. Once the police encountered LaGuardia, the officer observed that LaGuardia had a normal attitude and appearance. He did not smell alcohol on LaGuardia's breath. His speech was not slurred, his eyes were not bloodshot, his balance, coordination, and communication skills were all normal. He had not made any other observations regarding LaGuardia's demeanor at that point that would suggest intoxication. LaGuardia had a valid driver's license. No warrants were out for his arrest, and he was taken at his word that he had valid insurance coverage. The officer unequivocally testified that the only reason he continued to detain LaGuardia was "just that his story didn't make sense to me. It appeared that he was hiding something." He continued the detention and investigation because he just wanted to "see." He articulated no other reason.

We must take the officer at his word and not try to point to other reasons after the fact that *could* have justified his continued detention. Although he stated his deep concern that it was suspicious that LaGuardia left the scene, he did not charge LaGuardia with any

10

traffic offenses related to leaving the scene—which would have revealed criminal activity. So it could not be said that the stop could have been extended to issue a traffic ticket—therefore he did not measurably extend the stop to conduct the HGN test—because Opperman did not identify *any* traffic infraction warranting a citation at that point, nor did he indicate any intent to issue one.

The dissent and the State try to articulate a reason for Opperman after the fact to justify the delay. "Opperman's decision to conduct a DUI investigation stemmed from his training and experience and was based on the exercise of his commonsense judgment and inferences about human behavior." Slip op. at 16. But this is not what Opperman said. There was no testimony that his training and experience led him to believe that if someone does not wait in their car for a tow truck in the cold, when there is no indication about how long it will be before the tow truck can arrive in snowy conditions, that the person must be intoxicated. He did not indicate that he had experienced this situation before and such drivers were intoxicated—thereby justifying his suspicion. He did not testify that his training included this situation. He said *part* of his job was to investigate traffic accidents. He did not present any testimony regarding how many accidents he had investigated and what percentage of the accidents he investigated involved intoxicated drivers. He said in eight-and-a-half years he had been involved in approximately 30 DUI arrests or—at the most—4 per year. We do not know if those involved accidents or people trying to hide the fact that they were intoxicated by walking away from their car. There was no indication that his limited experience elevated his suspicion to one that was objectively reasonable based on the totality of the circumstances as viewed by a trained law enforcement officer. See *Sharp*, 305 Kan. at 1081.

Officer Opperman acted solely based on a hunch, nothing more. In his own words, he just wanted to "see." Thus, the district court erred in denying LaGuardia's request to suppress all evidence collected after the DUI investigation began. See *Wong Sun v. United States*, 371 U.S. 471, 484-87, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (Evidence

11

obtained as the result of a Fourth Amendment violation is inadmissible and must be suppressed.).

Because we find that there was no basis to expand the lawful seizure into a DUI investigation, we need not consider LaGuardia's alternative argument that the officer had no basis to request that he submit to a PBT.

We reverse and remand with instructions to suppress, upon retrial, all evidence collected after the officer decided to administer the HGN test.

Reversed and remanded with directions.

* * *

MALONE, J., dissenting: I respectfully dissent. Although this case may present a close question, I would find that Officer Eric Opperman had reasonable suspicion to investigate Leonard LaGuardia for driving under the influence (DUI). I would also find that Opperman had reasonable suspicion to request that LaGuardia submit to a preliminary breath test (PBT). Thus, I would affirm the district court's judgment denying LaGuardia's motion to suppress the evidence.

The Fourth Amendment to the United States Constitution and section 15 of the Kansas Constitution Bill of Rights prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Kan. Const. Bill of Rights, § 15. These rights are fundamental and must be safeguarded by the courts. The Kansas Supreme Court has long held that the search and seizure provisions of the Kansas and United States Constitutions are similar and provide the same rights and protections. See, e.g., *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014).

12

A traffic stop is a seizure triggering Fourth Amendment protections. *State v. Thompson*, 284 Kan. 763, Syl. ¶ 6, 166 P.3d 1015 (2007). In the landmark case of *Terry v. Ohio*, 392 U.S. 1, 20-23, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the United States Supreme Court held that a law enforcement officer may detain and briefly question a person without a warrant if the officer has reasonable suspicion that the person has committed, is committing, or is about to commit a crime. This law is codified in Kansas at K.S.A. 22-2402(1). In *Terry*, a plain-clothed police officer observed two men in the middle of the afternoon pacing back and forth in front of retail stores on a public street. Occasionally, the men peered inside the same store window. This activity went on for about 10 or 12 minutes until the men started to walk away. Although the officer observed no criminal activity, he testified that the men "'didn't look right to me at the time.'" 392 U.S. at 5. The officer suspected the men were "'casing a job, a stick up'" and feared "'they may have a gun.'" 392 U.S. at 6. The officer approached the men, identified himself as a police officer, and asked for their names. When the men "'mumbled something'" in response to his inquiries, the officer patted them down for weapons and found a gun in Terry's pocket. 392 U.S. at 7. Terry was convicted of carrying a concealed weapon, and the United States Supreme Court upheld the conviction finding the officer had reasonable grounds to stop the men and perform a limited search for weapons. 392 U.S. at 30-31.

LaGuardia's case does not focus on whether Opperman had reasonable suspicion to *initiate* a traffic stop, but it involves the *extension* of a traffic stop to investigate criminal activity beyond the initial purpose of the stop. "An officer may extend a traffic stop beyond the duration necessary to fulfill the purpose of the stop when a detainee's responses and the surrounding circumstances give rise to an objectively reasonable and articulable suspicion that criminal activity is occurring." *State v. Cash*, 313 Kan. 121, Syl. ¶ 4, 483 P.3d 1047 (2021). Thus, the issue here is whether Opperman reasonably extended the initial scope of the traffic stop—to investigate LaGuardia's involvement in the single car crash into a guardrail—to include a DUI investigation.

13

Reasonable suspicion does not conform to a concise definition or a precise quantification. It is a lower standard than probable cause, and "[w]hat is reasonable depends on the totality of the circumstances in the view of a trained law enforcement officer." *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017). The reasonable suspicion analysis requires the use of an objective standard, not a subjective standard based on the officer's personal belief. *Cash*, 313 Kan. at 130. A police officer must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant an investigatory detention. *Terry*, 392 U.S. at 21. "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000); see also *Kansas v. Glover*, 589 U.S. 376, 381, 140 S. Ct. 1183, 206 L. Ed. 2d 412 (2020) (holding that deputy's commonsense inference that the owner of a vehicle was likely the vehicle's driver provided reasonable suspicion to initiate a traffic stop). We make our determination with deference to a trained officer's ability to distinguish between innocent and suspicious circumstances. *Sharp*, 305 Kan. at 1081. To show reasonable suspicion for an investigatory stop, the State need not rule out the possibility that the suspect is engaged in innocent conduct. *Wardlow*, 528 U.S. at 125.

Turning to our facts, Opperman is a law enforcement officer with specific training and years of experience in detecting drivers impaired by alcohol consumption. Opperman testified that he first smelled the odor of alcohol on LaGuardia's breath when he began to perform the horizontal gaze nystagmus (HGN) test. But this fact cannot be considered in the reasonable suspicion calculus because the HGN test was already part of the DUI investigation. We must rely only on articulated facts that existed before Opperman extended the traffic stop to investigate a possible DUI.

The first relevant fact is that LaGuardia had crashed his car into a guardrail in a snowstorm. Opperman later testified that this fact was not suspicious "[i]n and of itself." But it is the first fact to consider under the totality of the circumstances. Next, the

14

accident happened at about 2 a.m. Opperman testified that based on his training and experience, intoxicated driving is more likely to happen at night. This observation is probably also a commonsense deduction.

Next, LaGuardia drove his heavily damaged vehicle with a missing bumper and a flat tire to a different location, rather than remaining at the scene of the accident. LaGuardia did not report his accident to the police, it was reported by a passerby. After LaGuardia parked his wrecked vehicle on a side street, he abandoned his car and walked in a snowstorm toward a gas station to wait for the tow truck he had called. Opperman testified that he thought it was suspicious that LaGuardia drove away from the crash scene, and he thought it was suspicious that LaGuardia did not wait in his car.

When Opperman eventually located LaGuardia, he learned that he had a valid driver's license and registration—all the more reason for LaGuardia not to have been afraid to report the accident. Opperman saw no immediate signs of alcohol impairment from LaGuardia's appearance. But based on Opperman's training and experience, he suspected that LaGuardia was trying to hide the fact that his impaired driving contributed to the accident. These facts lead Opperman to pursue a DUI investigation.

Opperman did not need to observe any criminal activity to investigate LaGuardia for DUI. He only needed to reasonably suspect that LaGuardia had committed a DUI. Perhaps an appellate court finds nothing suspicious about LaGuardia driving his heavily damaged vehicle away from an accident on a flat tire. But Opperman saw it differently. When asked why he began a DUI investigation, Opperman responded:

> "Based off of the crash at 2 a.m., no other vehicles involved and leaving the scene. It was clear he was trying to hide something. He had a valid license, the car was registered to him, he didn't have any warrants. Based on that, I suspected he was trying to hide that he was impaired at the time he was driving."

15

A hunch is "a guess or feeling not based on known facts." Webster's New World College Dictionary 710 (5th ed. 2018). Opperman's decision to pursue a DUI investigation was based on more than a hunch. He articulated specific facts that caused him to draw a rational inference as to why he suspected LaGuardia of committing a DUI. See *Terry*, 392 U.S. at 21. Even though there may have been an innocent explanation for some of LaGuardia's conduct, Opperman reasonably inferred from the facts before him that LaGuardia was trying to hide the fact that his impaired driving may have contributed to his car accident. Of course, this is precisely what LaGuardia later admitted he was doing, but the fact that Opperman was correct in hindsight cannot justify his actions.

A law enforcement officer needs probable cause that a crime has been committed to make an arrest. But for an officer to briefly detain a suspect to investigate possible criminal activity requires much less. Opperman's decision to conduct a DUI investigation stemmed from his training and experience and was based on the exercise of his commonsense judgment and inferences about human behavior. See *Wardlow*, 528 U.S. at 125. Although courts must decide the constitutional bounds, we should give some deference to a trained officer's ability to distinguish between innocent and suspicious circumstances in determining whether reasonable suspicion exists. See *Sharp*, 305 Kan. at 1081. Considering the totality of the circumstances, I would find that Opperman had a reasonable and objective suspicion to investigate LaGuardia for DUI. This finding is based only on the factors articulated by Opperman and is not based on any other factors that could have formed a reasonable suspicion but were not articulated by the officer.

The second issue is whether Opperman had reasonable suspicion to request that LaGuardia submit to a PBT. This issue is not close. In addition to the suspicious facts that caused Opperman to begin the DUI investigation, by the time Opperman asked LaGuardia to submit to a PBT, Opperman had smelled the odor of alcohol on LaGuardia's breath, LaGuardia had exhibited one clue on the one-leg stand test, and he had exhibited three clues on the walk-and-turn test, which amounted to a test failure.

16

These facts provided Opperman with reasonable suspicion to request that LaGuardia submit to a PBT. See K.S.A. 8-1012(a).

I would affirm the district court's judgment denying LaGuardia's motion to suppress the evidence.