IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 104,940

CITY OF WICHITA,
*Appellee*,

v.

WILLIAM J. MOLITOR,
*Appellant.*

SYLLABUS BY THE COURT

1.

Pursuant to K.S.A. 2010 Supp. 8-1012(b), an investigating officer must possess reasonable suspicion that a driver has been operating or attempting to operate a vehicle while under the influence of alcohol or drugs or both alcohol and drugs before requesting that the driver submit to a preliminary breath test.

2.

The horizontal gaze nystagmus (HGN) test is based on scientific principles and before the results from an HGN test may be considered by a Kansas court for any purpose, the State must establish the reliability of such a test in a district court within this state.

3.

To determine whether a law enforcement officer had the statutorily required reasonable suspicion to request a preliminary breath test of the driver of a motor vehicle, an appellate court must examine the totality of the circumstances existing at the time of the request, including the officer's testimony that the driver passed standardized field sobriety tests administered prior to the request.

1

4.

An appellate court should not deviate from the criteria and scoring of the National Highway Traffic Safety Administration's standardized testing model to glean reasonable suspicion of driving under the influence from the driver's successful completion of the standardized field sobriety tests.

Review of the judgment of the Court of Appeals in 46 Kan. App. 2d 958, 268 P.3d 498 (2012). Appeal from Sedgwick District Court; GREGORY L. WALLER, judge. Opinion filed January 30, 2015. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and remanded.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, argued the cause, and *E. Jay Greeno* and *Kristen B. Patty*, of Wichita, were with him on the briefs for appellant.

*Sharon L. Dickgrafe*, chief deputy city attorney, argued the cause, and *Michael J. Hoelscher*, assistant city attorney, and *Gary E. Rebenstorf*, city attorney, were on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: A law enforcement officer participating in a saturation patrol near a Wichita bar stopped a vehicle driven by William J. Molitor and subsequently conducted a driving under the influence (DUI) investigation. After Molitor failed the horizontal gaze nystagmus (HGN) test but passed the walk-and-turn and one-leg-stand tests, the officer requested a preliminary breath test (PBT), the results of which ultimately led to Molitor's arrest and conviction for DUI.

At a subsequent suppression hearing conducted on appeal to the district court, the court ruled that the HGN results could be admitted at that hearing to establish the officer's

reasonable suspicion of DUI, even though the results were inadmissible at trial. The Court of Appeals affirmed that the HGN test could be used to establish the statutorily required reasonable suspicion of DUI that would permit a request for a PBT. *City of Wichita v. Molitor*, 46 Kan. App. 2d 958, 959, 268 P.3d 498 (2012). Additionally, the panel held that, even if the HGN test results were excluded, the officer had enough other evidence to form a reasonable suspicion of DUI. We granted review and reverse both the panel and the district court.

FACTUAL AND PROCEDURAL OVERVIEW

On the evening of February 28, 2009, Officer Jeremy Diaz, while working with other officers on a traffic and DUI saturation patrol in Wichita, observed Molitor make a right turn at a stop sign without using the turn signal, albeit the officer noted that Molitor had made a complete stop at the sign, had turned appropriately into the correct traffic lane, and had driven straight down the street. The officer effected a vehicle stop based on the turn signal infraction, and, according to the officer, as Molitor pulled over, his vehicle struck the curb and came to a stop with the tire halfway up the curb. Molitor claimed that he did not drive up on the curb but rather bumped into the curb because it was located on the edge of the road. The stop was not videotaped.

Diaz approached the vehicle and observed that Molitor's eyes were watery and bloodshot and that a strong odor of alcohol was emanating from the vehicle. Diaz asked Molitor if he had been drinking, and Molitor responded that he had consumed two or three beers. Molitor's speech was not slurred; he had no difficulty producing his driver's license, insurance information, and vehicle registration; and he did not lose his balance while exiting his vehicle or walking thereafter. The officer continued to smell a strong odor of alcohol as Molitor exited the vehicle.

3

First, Officer Diaz administered the HGN test, recording that Molitor displayed six out of the six possible clues of intoxication. Next, Molitor scored one out of eight possible clues on the walk-and-turn test and one out of four possible clues on the one-leg stand test. Both tests require two clues before the results are indicative of unlawful intoxication. Notwithstanding the passing scores on two of the standardized field sobriety tests (SFSTs), Diaz requested that Molitor submit to a PBT. Molitor agreed to take the test and registered a breath alcohol content (BAC) of .090. After obtaining the PBT result, Diaz asked Molitor to take a trial-quality breath alcohol test, utilizing an Intoxilyzer 8000. This test was conducted about an hour after the initial stop and recorded a BAC of .091.

Molitor was charged and convicted in Wichita Municipal Court of DUI and failing to signal a turn. He appealed to the Sedgwick County District Court, and, prior to trial, moved to suppress the PBT and breath test results. Molitor argued that he had passed the only two "admissible NHTSA [National Highway Traffic Safety Administration] tests." Therefore, he argued, the evidence did not support that the officer had the requisite reasonable suspicion to request the PBT.

At the suppression hearing, Officer Diaz testified that he had successfully completed training on administering the HGN test. Molitor's attorney objected, claiming that Kansas caselaw holds that HGN test results are inadmissible in court for any reason. The district court overruled the objection, finding that although an HGN test result was inadmissible at trial, it could be used to support "probable cause." At the conclusion of the hearing, the district court judge denied the motion to suppress, finding that under the totality of circumstances, there was reasonable suspicion to request the PBT.

Molitor filed a motion to reconsider, arguing that HGN testing is not admissible in Kansas pursuant to *State v. Chastain*, 265 Kan. 16, 960 P.2d 756 (1998), and *State v.*

4

*Witte*, 251 Kan. 313, 836 P.2d 1110 (1992). The district court denied the motion to reconsider and held that even though HGN test results were not admissible "in a court of law, it's admissible for probable cause, it's admissible for reasonable suspicion." The district court also concluded that based on "all the circumstances, the driving, the breath, and the officer's observation of the defendant in the preliminary tests, that it was proper to request a preliminary breath test."

Subsequently, Molitor agreed to a bench trial on stipulated facts, with the understanding that he could appeal the denial of his motion to suppress the PBT and breath test. Based on the stipulated facts, the district court found that Molitor was guilty of DUI and failure to signal a turn. Molitor filed a timely appeal.

On appeal, Molitor argued that the district court abused its discretion by failing to follow binding Kansas Supreme Court precedent holding that evidence of HGN testing is inadmissible for any purpose. He also asserted that the district court abused its discretion by failing to properly analyze the arresting officer's opinion testimony pursuant to the provisions of K.S.A. 60-456. As a consequence, Molitor claimed the erroneous admission of the HGN evidence was prejudicial by depriving him of his due process right to a fair and impartial hearing on his motion to suppress.

The Court of Appeals panel first determined that no binding Kansas Supreme Court cases "directly address the issue of whether HGN evidence may be considered prior to trial as part of the totality of the circumstances in determining if a law enforcement officer had reasonable suspicion to request a PBT." *Molitor*, 46 Kan. App. 2d at 963. The panel found that while there was still considerable debate throughout other jurisdictions as to whether HGN test results could be admissible at trial, it was unable to find any authority from other jurisdictions holding that HGN test results could not be considered for the purposes of determining probable cause in a DUI case. 46 Kan. App.

2d at 965. The panel concluded that because reasonable suspicion is a less demanding standard than probable cause, "HGN test results may, under appropriate circumstances, be considered as part of the totality of the circumstances in determining whether a law enforcement officer has reasonable suspicion to request a PBT." 46 Kan. App. 2d at 965.

Interestingly, the panel then essentially rendered its HGN discussion superfluous dictum by proceeding to find that there was "sufficient evidence in the record to support the district court's conclusion that Officer Diaz had reasonable suspicion" to request the PBT, even without the HGN test results. 46 Kan. App. 2d at 966. Finally, the panel concluded that in light of Diaz' testimony regarding his successful completion of HGN test training and Molitor's failure to challenge Diaz' qualifications below, the district court did not abuse its discretion in admitting the officer's HGN testimony pursuant to K.S.A. 60-456, the provision governing the admission of opinion testimony. 46 Kan. App. 2d at 968.

Molitor filed a timely petition for review, arguing that the Court of Appeals erred in holding that HGN test results are admissible at a suppression hearing. He claims that the test for reliability set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) (*Frye* test) had to be met before HGN test results could be considered for *any* purpose, including a determination of whether reasonable suspicion existed to request a PBT. Molitor also sought review of the Court of Appeals' determination that the requisite reasonable suspicion existed without considering the HGN test results. This court granted Molitor's petition for review under K.S.A. 20-3018(b), obtaining jurisdiction under K.S.A. 60-2101(b).

6

The first question we address is whether evidence of the HGN test results was erroneously considered by the district court at the pretrial suppression hearing to make the determination that the arresting officer possessed reasonable suspicion to believe that Molitor had been operating a vehicle while under the influence of alcohol, which was a statutory prerequisite for the officer to request the PBT. See K.S.A. 2010 Supp. 8-1012(b) (law enforcement officer may request PBT if officer has reasonable suspicion to believe person guilty of DUI). In his petition for review, Molitor argued that both the district court and Court of Appeals violated the duty for lower courts to follow the precedent of the Kansas Supreme Court.

In a supplemental brief to this court, a subsequently appointed attorney for Molitor took the tack that it was procedural error for the district court to admit the HGN results, because K.S.A. 60-402 makes the same rules of evidence applicable to the pretrial suppression motion hearing as are applicable at the trial. Therefore, under that argument, given that the HGN results are inadmissible at trial, they must also be inadmissible at the pretrial suppression hearing as a matter of statutory procedure.

But we view the issue as more fundamental than construing whether the statutory rules of evidence permitted introduction of the HGN results at a pretrial suppression hearing. For instance, a prior panel of the Court of Appeals found that it was not an abuse of discretion for a district court to admit HGN evidence at a bench trial, notwithstanding its unreliability, because of the presumption that judges, unlike juries, would not be unduly swayed by inadmissible evidence. *State v. Ruth*, No. 101,209, 2009 WL 3428611, at *3 (Kan. App. 2009) (unpublished opinion). In other words, we are not so much concerned with whether the evidence was procedurally admissible at a particular hearing as we are with the overarching question of whether HGN testing is competent evidence

that can be relied upon when determining the existence of reasonable suspicion to believe that a vehicle driver was driving under the influence, regardless of whether that determination is being made at the scene, at a suppression hearing, or at trial. *Cf. State v. Shadden*, 290 Kan. 803, 819, 235 P.3d 436 (2010) ("*In addition* to considering K.S.A. 60-456, a district court must determine whether the *Frye* test has been met if an opinion is based on scientific methods or procedures and is offered for admission." [Emphasis added.]).

Accordingly, we will leave for another day any consideration of the general question as to whether the evidentiary rules at a suppression hearing are more relaxed than those at trial and proceed to consider the Court of Appeals' holding that HGN testing results may be considered as part of the totality of the circumstances in determining whether a law enforcement officer had the requisite reasonable suspicion to request a PBT. *Molitor*, 46 Kan. App. 2d at 965.

*Standard of Review*

The issue before us requires that we review the district court's legal conclusions, which is a de novo exercise. See *Martinez v. Milburn Enterprises, Inc.*, 290 Kan. 572, 579, 233 P.3d 205 (2010). Moreover, whether the district court failed to correctly apply the *Frye* standard for the admissibility of scientific evidence is an abstract question of law subject to de novo review. *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 455-56, 14 P.3d 1170 (2000). More specifically, the question of whether HGN test results are competent evidence of unlawful intoxication is a question of law. *Cf. State v. McClanahan*, 212 Kan. 208, 211, 510 P.2d 153 (1973) (competency of evidence is question of law).

*Analysis*

As a statutory condition precedent to requesting that Molitor submit to a PBT, Officer Diaz had to possess "reasonable suspicion to believe [Molitor] has been operating or attempting to operate a vehicle while under the influence of alcohol or drugs or both alcohol and drugs." K.S.A. 2010 Supp. 8-1012(b). In other words, to request that a driver submit to a PBT to aid in the establishment of the probable cause necessary to arrest the driver for DUI, an officer must have already acquired a reasonable suspicion that the driver was DUI. We have described reasonable suspicion and its relationship to probable cause as follows:

> "'Reasonable suspicion means a particularized and objective basis for suspecting the person stopped is involved in criminal activity. Something more than an unparticularized suspicion or hunch must be articulated. Reasonable suspicion can arise from information that is *less reliable* than that required to show probable cause. Both reasonable suspicion and probable cause are dependent upon the content of information possessed by the detaining authority *and the information's degree of reliability*. Quantity *and quality* are considered in the totality of the circumstances—the whole picture that must be taken into account when evaluating whether there is reasonable suspicion.' *State v. Toothman*, 267 Kan. 412, Syl. ¶ 5, 985 P.2d 701 (1999)." (Emphasis added.) *State v. Pollman*, 286 Kan. 881, 890, 190 P.3d 234 (2008).

The Court of Appeals was persuaded by cases from a number of sister states that have held HGN test results "to be properly considered as a factor in determining probable cause." 46 Kan. App. 2d at 964. Then, "[b]ecause reasonable suspicion is a less demanding standard than probable cause," the panel made new law in this state, finding "that testimony from a law enforcement officer trained in administering HGN tests may properly be considered as part of the circumstantial evidence used prior to trial in determining whether the totality of circumstances show that a law enforcement officer had reasonable suspicion to request a PBT." 46 Kan. App. 2d at 965. Given the binding

precedent that existed in this state, the panel erred in seeking guidance elsewhere. See *State v. Jones*, 44 Kan. App. 2d 139, 142, 234 P.3d 31 (2010), *rev. denied* 292 Kan. 967 (2011) (Court of Appeals duty bound to follow Kansas Supreme Court precedent).

The Court of Appeals recognized the existence of binding Kansas precedent dealing with the use of HGN testing, specifically citing to *Shadden*, 290 Kan. at 821-22; *Chastain*, 265 Kan. at 22-23; and *Witte*, 251 Kan. at 322. The panel observed that in *Witte*, "the Kansas Supreme Court distinguished [the] HGN test[] from other field sobriety tests because it is based on scientific principles outside the scope of common knowledge." *Molitor*, 46 Kan. App. 2d at 962. The panel further acknowledged that, because of that distinction, the *Witte* court required that the foundational requirements of *Frye* must be met before HGN test results can be used. But the panel appears to have narrowed the scope of *Witte*'s foundational requirement to only apply "before HGN test results may be admitted *at trial*." (Emphasis added.) 46 Kan. App. 2d at 962. A closer review of *Witte* belies the panel's narrow construction of its holding.

When *Witte* was decided, a person committed the crime of DUI under K.S.A. 8-1567(a)(1) by operating or attempting to operate a vehicle with a blood or breath alcohol concentration of .10 or higher. The opinion noted that NHTSA claimed that "the HGN test is an accurate and effective field sobriety test to determine whether a driver's alcohol concentration is above .10." 251 Kan. at 315.

*Witte* then discussed HGN testing and scoring, beginning with a description of nystagmus as "'an involuntary rapid movement of the eyeball, which may be horizontal, vertical, rotatory, or mixed,'" and defining HGN as "'a jerking of the eyes as they gaze to the side.'" 251 Kan. at 316. In the field, the trained officer holds an object, such as a pen or a finger, about 12 to 15 inches in front of and level with the driver's eyes. The driver is to keep his or her head steady and use his or her eyes to follow the object as the officer

10

moves it to the side. The first side movement is all of the way until the driver's eyes can go no further sideways. Then the movement is repeated from the front to a point that the officer estimates is a 45-degree angle of gaze. The test is performed to both sides, *i.e.*, the left and right eyes are tested separately.

In scoring the test, the officer looks for three possible signs of intoxication for each eye, for a total of six clues. The first intoxication sign—the angle of onset of nystagmus—is premised upon the theory that the more intoxicated a person becomes, the sooner the jerking will occur during the eye's sideward movement. The NHTSA asserts that the expected angle of onset when the driver's BAC is .10 is approximately 40 degrees.

The second HGN intoxication sign involves observing how distinct the nystagmus is at maximum deviation, *i.e.*, at the point where the eye is as far to the side as possible. Presumably, this means that the officer must assess the level of jerkiness at maximum deviation because the theory is that the jerking will increase in intensity as the level of intoxication increases.

The third sign is smooth pursuit, *i.e.*, the officer assesses the smoothness with which the driver's eye pursues the object as the officer moves it sideways. This assessment is based upon the supposition that the eyes of an intoxicated person often cannot smoothly follow a slowly moving object.

One point is assigned for each clue of intoxication, so that failing all possible clues earns a score of 6 points. According to NHTSA, a score of 4 or more points indicates a BAC above .10.

Witte's complaint on appeal was that the district court had erroneously denied his motion in limine to prevent the State from presenting evidence of the HGN results. He claimed that the HGN test is scientific evidence; that the State had failed to establish that such scientific evidence met the *Frye* test; that the officer had not properly conducted the testing; and that the HGN test is simply not scientifically reliable evidence. The *Witte* court declared that the questions of whether the HGN test is scientific evidence and whether it meets the *Frye* admissibility requirements were issues of first impression in Kansas at that time. 251 Kan. at 318.

With respect to the scientific evidence question, *Witte* considered and rejected the State's argument, apparently adopted by some other jurisdictions, that the HGN test only involves the officer's objective personal observation of the driver's conduct, much the same as the one-leg stand test, and therefore does not require expert interpretation. *Witte* noted that alcohol's effect on a person's sense of balance is common knowledge but that the same could not be said for the principles underlying the HGN test. Accordingly, given that the HGN is based upon scientific principles that exceed common knowledge, *Witte* held that HGN test results are scientific evidence subject to the *Frye* foundation requirements. 251 Kan. at 322.

The *Witte* court then considered the State's argument that it did not have to establish the reliability of HGN evidence through expert testimony in this state because other jurisdictions had recognized HGN evidence as being reliable under the *Frye* test. After reviewing decisions in other jurisdictions—principally Arizona and Louisiana— that had found HGN testing to be scientifically reliable, the *Witte* court turned to a discussion of the results of its own research, a significant portion of which called into question the scientific bona fides of the HGN test. Indeed, one cited commentator referred to the HGN as "voodoo science." 251 Kan. at 326 (citing to Pangman, *Horizontal Gaze Nystagmus: Voodoo Science,* 2 DWI Journal 1, 3-4 [1987]).

12

One area of concern strikes at the heart of the HGN theory, *i.e.*, the angle of nystagmus onset. Although the NHTSA maintains that observing nystagmus at the 45-degree angle correctly foretells a .10 BAC 78% of the time, other researchers dispute that 45 degrees is the appropriate angle of onset. For instance, one authority asserts that 50% to 60% of sober individuals who deviate their eyes more than 40 degrees to the side will exhibit nystagmus that is indistinguishable from alcohol gaze nystagmus. 251 Kan. at 327 (citing Pangman, 2 DWI Journal at 2 [citing Toglia, Electronystagmography: Technical Aspects and Atlas (1976)]). Accordingly, "[r]esearchers have expressed concern that the 45-degree angle used by the NHTSA will create false positive readings." 251 Kan. at 328. Some have even criticized the NHTSA study for deliberately screening out persons at high risk for being classified as a false positive and for conducting its tests with mechanical devices that hold the person's head steady while precisely measuring the angle of lateral deviation of the eye. Of course, in the field, the driver is merely told to hold his or her head steady and the officer estimates the point at which the eye has reached a 45-degree angle.

Another concern addressed was that "many other factors can cause nystagmus," such as suffering from such innocuous conditions as influenza or eyestrain; or consuming such common commodities as caffeine, nicotine, or aspirin. 251 Kan. at 328. Even "[a]n individual's circadian rhythms (biorhythms) can affect nystagmus readings—the body reacts differently to alcohol at different times of the day." 251 Kan. at 328.

Perhaps most compelling was the research study done by "[a] prosecution-oriented group in California," measuring the correlation between a police officer's estimations of the angle of onset of nystagmus and the actual results of chemical testing of blood samples (as opposed to breath samples). 251 Kan. at 329. Quoting from Pangman, 2 DWI Journal at 3, *Witte* recited that "'[t]he data in the study revealed that there was virtually no

correlation between the actual value of blood alcohol concentration and the predicted value based upon the angle of onset of nystagmus.'" 251 Kan. at 329. After noting that the study group conceded that the HGN should not be used to predict a person's blood alcohol level, *Witte* concluded as follows:

> "If the Arizona Supreme Court had had this evidence before it, it may not have held that HGN evidence satisfies the *Frye* admissibility requirements. The reliability of the HGN test is not currently a settled proposition in the scientific community. This court holds that HGN evidence requires a *Frye* foundation for admissibility. If the *Frye* foundation is established to this court's satisfaction, HGN evidence will be admitted in other cases without the need to satisfy the *Frye* test each time. Before this court rules on whether HGN evidence satisfies the *Frye* admissibility requirements, a trial court first should have an opportunity to examine, weigh, and decide disputed facts to determine whether the test is sufficiently reliable to be admissible *for any purpose in Kansas*." (Emphasis added.) 251 Kan. at 229-30.

Although the case involved the admission of HGN evidence at trial, the *Witte* opinion did not limit its holding to that scenario. To the contrary, the opinion plainly informed judges and prosecutors that the first thing that had to happen before any court in this state could admit HGN evidence *for any purpose* was that the State had to present an appropriate *Frye* foundation to a trial court which would then be convinced to find that the HGN test was sufficiently reliable to be admissible. Notwithstanding the passage of more than two decades since *Witte*'s direction, the State has yet to follow the procedure outlined in *Witte* as being necessary to establish the reliability of the HGN test. Indeed, we are unaware of any proceeding in which the reliability of the HGN has been established under any standard. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (establishing alternative to *Frye* test utilized in federal courts); see also K.S.A. 2014 Supp. 60-456(b) (establishing criteria for admitting scientific opinion testimony).

14

Notwithstanding *Witte*'s clear directive that a trial court must first "examine, weigh, and decide disputed facts to determine whether the [HGN] test is sufficiently reliable to be admissible for any purpose in Kansas," *State v. Witte*, 251 Kan. 313, 330, 836 P.3d 1110 (1992), the Court of Appeals made the curious declaration that "[i]t is important to note that the issue presented in this case is not whether HGN testing has now reached the level of acceptance to satisfy the *Frye* test." *City of Wichita v. Molitor*, 46 Kan. App. 2d 958, 963, 268 P.3d 498 (2012). But, of course, that is precisely the issue in this case, and any case in which the HGN test is involved, until it is proved reliable.

Granted, as suggested above, reasonable suspicion can be established with evidence that is less reliable than that which is required to establish guilt beyond a reasonable doubt or even to establish probable cause. But there is a threshold level of reliability that must be met. One must show that any proffered evidence that is ostensibly based upon scientific principles does, in fact, have some credible correlation to the matter that must be proved. For instance, consider the hypothetical scenario of an officer who testified that the officer had undergone extensive training in the operation of a Ouija Board; that when a Ouija Board is asked if the driver being tested is DUI, the Board's arrow will point at "yes or "no"; that random sampling has shown that the Ouija Board correctly identifies when a driver's intoxication exceeds the legal limit 60% of the time; and that the Board's arrow pointed at "yes" when asked if Molitor was DUI. Should a court allow the officer to base reasonable suspicion upon the Ouija Board test results? Of course not. And at this point in the state of Kansas, the HGN test has no more credibility than a Ouija Board or a Magic 8 Ball. To change that circumstance, the State needs to prove the legitimacy of the test, as *Witte* directed.

The panel also declared that it was not deciding the question of whether HGN evidence should be admissible to prove "a specific BAC." But it is important to keep in

15

mind that the officer must reasonably suspect unlawful activity and it is not unlawful to simply drink and drive. Rather, in order to request a PBT, the officer must have "reasonable suspicion to believe the person has been operating or attempting to operate a vehicle *while under the influence of alcohol . . . .*" (Emphasis added.) K.S.A. 2010 Supp. 8-1012(b). To be operating a vehicle under the influence of alcohol, pursuant to K.S.A. 2010 Supp. 8-1567(a)(1) or (2), the alcohol concentration in the person's blood or breath must have reached the level of .08 or more. If, as the above-referenced California study concluded, the HGN is essentially useless in predicting a person's blood alcohol level, then it is difficult to understand how that test can provide reasonable suspicion that a driver was driving under the influence of alcohol, as opposed to driving after two beers.

Accordingly, we hold that the district court and the Court of Appeals erred in allowing the State to rely on the scientifically unproved HGN test results to establish the requisite reasonable suspicion that permitted the officer to request that Molitor submit to a PBT pursuant to K.S.A. 2010 Supp. 8-1012(b). Such a fundamental error cannot be deemed to be harmless, unless the other evidence was sufficient to establish the requisite reasonable suspicion without considering the HGN test results, *i.e.*, unless the panel's opinion on the use of the HGN test results was merely judicial dictum. See Black's Law Dictionary 549 (10th ed. 2014) (judicial dictum is opinion "that is not essential to the decision"); see also *Law v. Law Company Building Assocs.*, 295 Kan. 551, 564, 289 P.3d 1066 (2012) ("'Nobody is bound by dictum . . . .'").

HARMLESS ERROR

After having determined that the HGN test results were appropriately considered as part of the totality of the circumstances that supported the finding that Officer Diaz had reasonable suspicion to believe that Molitor was operating his vehicle while under the influence of alcohol, the panel then embarked on an analysis of the hypothetical

16

question of whether the evidence would have been sufficient to establish reasonable suspicion if the HGN test results had been excluded. If we were to agree with the panel's use of the HGN test results as part of the totality of the circumstances affecting the reasonable suspicion analysis, we would forego consideration of the academic question of whether excluding the HGN test would change the result. But given our exclusion of the HGN testing, we must proceed to analyze the other evidence to determine whether the consideration of the HGN test results was harmless error.

*Standard of Review*

Whether reasonable suspicion exists is a question of law, and appellate courts review this question with a mixed standard of review, determining whether substantial competent evidence supports the district court's factual findings, while the legal conclusion is reviewed de novo. *State v. Thomas*, 291 Kan. 676, 688, 246 P.3d 678 (2011).

*Analysis*

Molitor argues that the district court and the Court of Appeals ignored the evidence which indicated that he was not impaired by alcohol. The record indicates that the lower courts did mention the exculpatory evidence, but it appears that it was not fully integrated into the totality of the circumstances calculus.

The Court of Appeals listed "the factors supporting reasonable suspicion" as being "striking the curb, very strong odor of alcohol, bloodshot and watery eyes, admission to drinking beer, losing balance during instruction phase of walk-and-turn test, and putting foot down on the one-leg-stand test." *Molitor*, 46 Kan. App. 2d at 967. The panel summarily dismissed the exculpatory evidence, as follows:

17

"We note that there is evidence in the record that Molitor was able to speak without slurring his words, produced his identification without difficulty, and had only one clue each on the walk-and-turn test and the one-leg-stand test. But we do not find that these factors substantially dissipated Officer Diaz' reasonable suspicion that Molitor had operated a vehicle under the influence of alcohol." 46 Kan. App. 2d at 967.

After the panel filed its opinion in this case, this court decided *State v. Edgar*, 296 Kan. 513, 294 P.3d 251 (2013), which involved the question of the role that passing grades on field sobriety tests should play in the analysis of whether the investigating officer possessed the requisite reasonable suspicion to request a PBT. *Edgar* clarified that "[w]hether a law enforcement officer has the statutorily required reasonable suspicion to request a preliminary breath test is determined by examining the totality of the circumstances existing at the time of the request" and that the driver's performance on field sobriety tests given before the PBT request is a circumstance that must be included in the totality of circumstances examination. 296 Kan. 513, Syl. ¶ 2.

Here, the panel correctly stated that the totality of the circumstances paradigm was applicable, and it appeared to grasp the essence of that test when it declared: "'Quantity and quality are considered in the totality of the circumstances—the whole picture that must be taken into account when evaluating whether there is reasonable suspicion.' See *State v. Toothman,* 267 Kan. 412, Syl. ¶ 5, 985 P.2d 701 (1999)." *Molitor*, 46 Kan. App. 2d at 966. But then, rather than looking at the whole picture to make a single, totality-of-the-circumstances reasonable suspicion determination, the panel broke the analysis into two parts. It first determined that the inculpatory factors it had identified would have justified an officer's reasonable suspicion, and then it assessed whether the acknowledged exculpatory factors "substantially dissipated" the previously formed reasonable suspicion. 46 Kan. App. 2d at 967. But in exercising the totality of circumstances test for reasonable suspicion, an appellate court should not engage in "'assessing each factor or piece of evidence in isolation. [Citations omitted.]'" *United States v. Jones*, 701 F.3d 1300, 1315

18

(10th Cir. 2012). The determination that reasonable suspicion existed obtains only after the interaction of all factors is assessed.

Before discussing the interaction of the factors present in this case, we pause to reiterate that, under the applicable version of the statute, Officer Diaz had to reasonably suspect that Molitor was illegally driving his vehicle while under the influence of alcohol before he could request a PBT. K.S.A. 2010 Supp. 8-1012(b). Interestingly, an earlier version of K.S.A. 8-1012 permitted a law enforcement officer to request a PBT based upon "reasonable grounds to believe that the person:  (a) Has alcohol in the person's body; . . . ." K.S.A. 8-1012 (Furse 2001). Although "reasonable grounds" was equated with probable cause (not reasonable suspicion) under the prior statute, the focus of the inquiry was not whether the driver was operating the vehicle under the influence, but rather whether the driver "had alcohol in her body." *Gross v. Kansas Dept. of Revenue*, 26 Kan. App. 2d 847, 849, 994 P.2d 666, *rev. denied* 269 Kan. 932 (2000).

Logically, then, an officer's subjective observations that the driver smelled of alcohol, or had bloodshot and watery eyes, would be more compelling evidence where the matter to be proved was simply that the driver had alcohol in his or her system rather than where the question is the legality of the alcohol concentration in the driver's body, *i.e.*, whether it had reached the level of .08 or more. Likewise, the nature of the driver's admission to having drunk two or three beers is different for the two inquiries. Under the old statute, it would be compelling evidence that the driver had alcohol in his or her body, whereas, under the current statute, it would be evidence that tends to refute the notion that the driver was operating the vehicle with an illegal level of alcohol in his or her body, *i.e.*, it is questionable whether two or three beers would raise the alcohol concentration in the breath or blood of a normal size man to .08 or more.

Moreover, an officer's sensory perceptions, such as the strength of the alcohol odor or the condition of the driver's eyes, are subject to an imprecise personal opinion. Moreover, that subjective assessment might be influenced by the subsequent discovery that the driver failed the PBT. Indeed, the California study on the HGN test discussed in *Witte* frankly reported that "'the cops fudged the horizontal gaze nystagmus determination to correspond with the already known correct answer determined by the breath test result.'" 251 Kan. at 329 (quoting Pangman, 2 DWI Journal at 3).

In contrast, the SFSTs were developed by the NHTSA after both laboratory studies and field studies, from which clues were identified and a scoring criteria developed that would provide an objective assessment as to the probability that the driver's alcohol concentration was at an unlawful level (.10). See Rubenzer, *The Standardized Field Sobriety Tests*: *A Review of Scientific and Legal Issues*, 32 Law & Hum. Behav. 293 (2008). For instance, the arresting officer in the *Shadden* case testified at trial that if a driver exhibits two clues, he or she fails the SFST, creating a 68% probability that the driver's concentration of alcohol is .10 or more. *State v. Shadden*, 290 Kan. 803, 806-07, 235 P.3d 436 (2010). In other words, SFSTs are alleged to result in an objective assessment of the *level of alcohol* in a driver's body, rather than just the presence of alcohol in the body.

Granted, the officer here testified that Molitor ran into or onto the curb while stopping his vehicle. Obviously, evidence of unsafe driving can suggest intoxication. But that alleged lapse of coordination must be viewed in conjunction with what followed. After stopping the vehicle, Molitor spoke without slurring his words, produced his identifying documents without difficulty, exited and proceeded from his vehicle without losing his balance, and, most importantly, passed the two admissible SFSTs. In other words, under the totality of circumstances, one could not reasonably suspect that

20

Molitor's balance was impaired by alcohol to the point of being legally under the influence of alcohol.

Moreover, in *Pollman*, this court set a low bar for the observable indicia of intoxication that can support reasonable suspicion, noting only the smell of alcohol and the driver's admission to having drunk alcohol, in addition to the acts leading to the criminal obstruction of official duty charges. *State v. Pollman*, 286 Kan. 881, Syl. ¶ 7, 190 P.3d 234 (2008). But here, the subjective observations which might suggest to Officer Diaz that Molitor was illegally intoxicated were offset by the objective indications that he was not. Indeed, if Molitor had failed the objectively scored SFSTs, one would suspect that the State would be arguing that the officer's trained observations were corroborated by the psychomotor testing.

Curiously, the panel padded its description of the intoxication indicia by referring to the one clue on each SFST to which the officer testified. But the officer admitted that Molitor passed the tests, and we have nothing in the record which would tell us what one clue reveals about a person's alcohol concentration level. Indeed, "[s]everal studies suggest that cut-off scores are set too low on the psychomotor SFSTs," and one study "found that over 50% of drivers at .00% BAC failed Walk and Turn." Rubenzer, 32 Law & Hum. Behav. at 297. The panel should not have deviated from the criteria and scoring of the NHTSA's standardized testing model to glean reasonable suspicion of DUI from a successful completion of the admissible SFSTs.

In short, we reverse the determinations of both the district court and the Court of Appeals that Officer Diaz possessed the requisite reasonable suspicion that Molitor was operating his vehicle while under the influence of alcohol when the officer requested that Molitor submit to a PBT.

Reversed and remanded.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

\* \* \*

BILES, J., concurring in part and dissenting in part:  I agree with the portion of the majority's opinion holding it was error to allow the State to rely on the horizontal gaze nystagmus (HGN) test results to establish reasonable suspicion for the officer's request for a preliminary breath test (PBT) because the State has not established the test's reliability as required by *State v. Witte*, 251 Kan. 313, 836 P.2d 1110 (1992). But I disagree with what the majority characterizes as a harmless error analysis in which the majority concludes the remaining evidence failed to independently establish the required reasonable suspicion to satisfy K.S.A. 2010 Supp. 8-1012(b). I would affirm the district court and the Court of Appeals on this point and affirm the conviction. I believe the majority is setting a standard higher than what reasonable suspicion requires.

This court recently considered whether an officer had reasonable suspicion to request a PBT in *State v. Edgar*, 296 Kan. 513, 294 P.3d 251 (2013). There we noted "[r]easonable suspicion is a less demanding standard than probable cause and requires considerably less than a preponderance of the evidence." 296 Kan. at 521 (citing *State v. Pollman*, 286 Kan. 881, Syl. ¶ 6, 190 P.3d 234 [2008]). We defined "reasonable suspicion" as

[1]REPORTER'S NOTE:  Senior Judge Malone was appointed to hear case No. 104,940 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.

""a particularized and objective basis for suspecting the person stopped is involved in criminal activity. *Something more than an unparticularized suspicion or hunch must be articulated.* Reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Both reasonable suspicion and probable cause are dependent upon the content of information possessed by the detaining authority and the information's degree of reliability. Quantity and quality are considered in the totality of the circumstances—the whole picture that must be taken into account when evaluating whether there is reasonable suspicion."' [Citations omitted.]" (Emphasis added.) 296 Kan. at 521.

As that standard suggests, we review reasonable suspicion determinations by considering the totality of the circumstances—as viewed by a reasonable law enforcement officer. More specifically, we determine

"whether reasonable suspicion exists 'with deference to a trained law enforcement officer's ability to distinguish innocent and suspicious circumstances [citation omitted], remembering that reasonable suspicion represents a "*minimum level* of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence."'" (Emphasis added.) *State v. Morlock*, 289 Kan. 980, 995, 218 P.3d 801 (2009) (quoting *State v. Moore*, 283 Kan. 344, 354, 154 P.3d 1 [2007]).

The Court of Appeals panel concluded reasonable suspicion existed because of Molitor's "striking of the curb, very strong odor of alcohol, bloodshot and watery eyes, admission to drinking beer, losing balance during instruction phase of [the] walk-and-turn test, and putting [his] foot down on the one-leg-stand test." *City of Wichita v. Molitor*, 46 Kan. App. 2d 958, 967, 268 P.3d 498 (2012). But in doing so, it also acknowledged and considered the evidence in the record supporting the conclusion that Molitor was not intoxicated, noting he "was able to speak without slurring his words, produced his identification without difficulty, and had only one clue each on the walk-and-turn test and the one-leg-stand test." 46 Kan. App. 2d at 967.

In *Edgar*, we held field sobriety test results administered before the PBT is requested should be considered when deciding whether reasonable suspicion existed to request the PBT. 296 Kan. at 525. But, as we recognized in *Edgar*, the driver's successful performance on a field sobriety test does not necessarily dispel an officer's reasonable suspicion. 296 Kan. at 524 (citing several cases holding reasonable suspicion was not dispelled by driver's perfect or adequate performance on sobriety testing); see also *Smith v. Kansas Dept. of Revenue*, 291 Kan. 510, 513-15, 242 P.3d 1179 (2010) (defendant's positive facts did not negate other facts in determining whether the trooper should have requested the PBT or evidentiary breath test).

But the majority for the first time in our caselaw establishes two classes of evidence and assigns greater weight to the standardized field sobriety tests, *i.e.*, the walk-and-turn and one-leg stand tests. In its view, the officer's "subjective observations" that Molitor was intoxicated, *i.e.*, the perceived strength of the alcohol odor or the driver's bloodshot and watery eyes, as a matter of law are "offset" by the "objective indications" that he was not, *i.e.*, field sobriety tests in which Molitor did not exhibit enough indicators of intoxication to predict from the tests that he was unlawfully impaired. Slip op. at 19.

The rationale for giving the officer's observations lesser weight—"that an officer's sensory perceptions, such as the strength of the alcohol odor or the condition of the driver's eyes, are subject to an imprecise personal opinion"—necessarily applies in every case. See slip op. at 20. This suggests the majority's analysis will require its comparative weighting in all future cases. Are we to believe that an officer's observation that the driver had slurred speech or fumbled for a driver's license will similarly be termed a "subjective observation" and given less weight? If so, this has never been our caselaw, as mostly recently rejected in *Edgar*. 296 Kan. at 523-24.

24

Similarly, the majority discounts Molitor's on-site admission to the investigating officer that he had been drinking "approximately two or three beers." The majority then concludes this admission refutes the officer's reasonable suspicion because "it is questionable whether two or three beers would raise the alcohol concentration in the breath or blood of a normal size man to .08 or more." Slip op. at 19. Such an analysis is obviously marred by a number of assumptions, most notably that the driver truthfully reported how many drinks he "approximately" had. Moreover, the record contains no evidence regarding Molitor's body size, how many ounces would constitute a beer, or the size of the bottle or glass.

I fail to see how the majority's conjecture about normal body size or the quantity and effects of consumption negates Molitor's admission that he was drinking. It also tramples on the deference our caselaw says should be given to the officer about what that admission might have meant in light of the officer's other observations, *i.e.*, the strong odor of alcohol, Molitor's bloodshot and watery eyes, and his impaired driving skills. Reasonable suspicion, after all, is determined by looking at the totality of circumstances as viewed by a reasonable law enforcement officer. *Edgar*, 296 Kan. at 521 (citing *Pollman*, 286 Kan. at 890).

K.S.A. 2010 Supp. 8-1012(b) allows a law enforcement officer to "request a person who is operating or attempting to operate a vehicle within this state to submit to a preliminary screening test of the person's breath to determine the alcohol concentration of the person's breath *if the officer has reasonable suspicion to believe the person has been operating or attempting to operate a vehicle while under the influence of alcohol or drugs or both alcohol and drugs*." (Emphasis added.) In Kansas, driving under the influence includes operating or attempting to operate any vehicle within this state while (1) the alcohol concentration in the operator's blood or breath is .08 or more; or (2) under

the influence of alcohol to a degree that renders the person incapable of safely driving a vehicle. K.S.A. 2010 Supp. 8-1567 (a)(1) and (a)(3). The PBT authorized by K.S.A. 2010 Supp. 8-1012(b) is simply an investigatory step toward determining whether the crime of DUI may be established. *Edgar*, 296 Kan. at 520.

Recounting then the circumstances that for me supply a "minimum level of objective justification" for the PBT as explained in *Edgar*, 296 Kan. at 521, I would cite: (1) Molitor's admission of alcohol consumption; (2) the strong odor of alcohol on Molitor during the traffic stop; (3) Molitor's watery and bloodshot eyes; (4) Molitor driving his vehicle into the curb while pulling over and stopping the vehicle with the right front tire halfway up the curb; and (5) the indicators of impairment Molitor displayed during field sobriety tests when he lost his balance during the instruction phase of the walk-and-turn test and put his foot down on the one-leg-stand test. In short, the officer observed evidence indicating impaired driving and intoxication and was justified under the statute to request the PBT.

For these reasons, I would affirm the conviction based on the officer's reasonable suspicion to request a PBT even without the HGN test results.

NUSS, C.J., and ROSEN, J., join in the foregoing concurring and dissenting opinion.